**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BROSNAN RISK CONSULTANTS, LTD., <br><br> Plaintiff, <br><br> -against- <br><br> AARON MURAUSKAS; QUIENTEN BOSTON; and CONTROLLED F.O.R.C.E., INC., <br><br> Defendants. | Case No. |

## VERIFIED COMPLAINT

Plaintiff Brosnan Risk Consultants, Ltd. ("Plaintiff" or "Brosnan"), by and through its counsel, Littler Mendelson, P.C., by way of Verified Complaint against Defendants Aaron Murauskas ("Murauskas"), Quienten Boston ("Boston") and Controlled F.O.R.C.E., Inc. ("Controlled Force") (together, "Defendants"), hereby alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an action brought by Brosnan for injunctive and legal relief to enforce post-employment restrictive covenants agreed to by its former employees Murauskas and Boston and to prevent them and their new employer Controlled Force from unfairly competing, soliciting its employees and customers, and tortiously interfering with its business.

2.     Brosnan is a security services company that provides, among other things, security officer and guard services to its clients. Controlled Force is a direct competitor in this highly specialized field. It specifically provides security officer and guard services in Minnesota through its subsidiary, Talon Investigation Ltd. ("Talon"), which is a private security contractor located in the greater Twin Cities metro area.

3.     Murauskas (former Vice President, Regional Manager – Midwest) and Boston (former Field Supervisor – Minnesota) signed agreements at the commencement of their employment that prohibit them from soliciting Brosnan's employees and customers for a period of two years and prohibit them from using Brosnan's trade secrets and confidential information in the event their employment terminated for any reason.

4.     After purposely harming Brosnan's reputation and relationships with its customers, Murauskas resigned from Brosnan on December 27, 2021, and became employed as Senior Director of Administration by rival security company, Controlled Force.  Controlled Force specifically tasked Murauskas with developing business and growing Talon.

5.     Instead of just resigning from Brosnan and joining Controlled Force, Murauskas repeatedly violated his obligation not to solicit Brosnan's employees by soliciting at least five key Brosnan employees, including Boston, Midwest Human Resources Generalist Melleah Hook, and Midwest Human Resources Coordinator Brittany Stone.

6.     As a result of Murauskas's recruitment, Boston left Brosnan on March 26, 2022 to join Controlled Force as its Field Security Manager for its subsidiary Talon and was tasked with developing business for Talon.

7.     Boston also unlawfully attempted to recruit at least two Brosnan employees on behalf of Controlled Force.

8.     In addition, Brosnan learned on May 2, 2022 that Murauskas and Boston solicited and stole a Brosnan customer account called Loring Towers, which generated over $1.6 million in revenue for Brosnan from July 27, 2020 to April 21, 2022.

9.     Controlled Force was aware of Murauskas's and Boston's contractual obligations at the time they diverted the Loring Towers account from Brosnan and induced them to violate

their contracts.  Indeed, four days before the account was diverted, Brosnan sent Controlled Force a letter with a copy of Murauskas's agreement, warning Controlled Force of Murauskas's post-employment obligations to Brosnan.  Further, on the very same day that the account was diverted, Diana Grano, Controlled Force President and CEO, contacted counsel for Brosnan by telephone and falsely asserted that Boston did not work for Controlled Force, that Controlled Force was not looking for security guard work, and that she would make sure that Murauskas does not solicit any of Brosnan's employees or customers.

10.     Accordingly, Brosnan brings this action to enjoin Murauskas and Boston from continuing to violate their contractual obligations, including prohibiting them from soliciting Brosnan's employees and customers.  It further seeks to enjoin Controlled Force from interfering with the employment agreements between Brosnan and its current and former employees.

## THE PARTIES

11.      Brosnan is a citizen of New York, as it is a New York corporation and has its principal place of business in New York.

12.     Controlled Force is a citizen of Illinois, as it is incorporated in Illinois and its principal place of business is in Illinois.

13.     Upon information and belief, Murauskas is a citizen of Illinois who resides at 171 W Fullerton Ave., Glendale Heights, IL 60139.

14.     Upon information and belief, Boston is a citizen of Minnesota who resides at 1213 14th Ave. SE, St. Cloud, Minnesota 56034.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction over the pending matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to this proceeding occurred in this district.  Namely, Murauskas resides in Glendale Heights, Illinois, worked for Brosnan in this district, and now works for Controlled Force in this district; and Controlled Force is headquartered in this district and employs Murauskas and Boston.

## FACTUAL ALLEGATIONS

### A.     Brosnan

17.     Brosnan is a full-service protective, investigative and intelligence firm to a global network of clients.  It is the largest privately-held security services company in America.

18.     For over 25 years, Brosnan has leveraged evolving technologies, manpower and data to reduce organizational risk to clients.  Brosnan operates in 45 states and over 450 cities.

19.     Brosnan's suite of products and services includes Security Officers, Executive Protection, Emergency Response and Disaster Recovery, COVID-19 protection, Comprehensive Risk Consulting, Employee Background Screening, Security Software & Technology, Systems Integration and Investigations.

### B.     Controlled Force

20.      According to its website, Controlled Force has leveraged 25 years of experience to provide a variety of security services.

21.     Controlled Force provides a wide variety of security officers that can serve both armed and unarmed.

22.     Controlled Force's subsidiary, Talon Investigation, Ltd. (located in St. Paul, Minnesota), is growing and is actively recruiting in direct competition with Brosnan, which is contrary to Controlled Force's CEO's representations to Brosnan's counsel.  A copy of an April 13, 2022 Unarmed Security Officer job posting on www.salary.com by "Talon Investigation a division of Controlled FORCE, Inc." is attached as **Exhibit A**.

23.     Controlled Force directly competes with Brosnan in the security officer and guard services industry, including through its subsidiary, Talon.

C.      **Murauskas's Employment with Brosnan**

24.     Brosnan hired Murauskas as a District Manager on or about April 15, 2019.

25.     Murauskas's responsibilities as a District Manager focused on the following:

- Delivering high quality customer service through regular contact with clients and evaluates service quality to initiate corrective action when necessary.

- Conducting in person site visits to customers and site employees weekly to ensure client and employee satisfaction and identifying opportunities for improvement.

- Identifying opportunities and execute plans to improve client satisfaction and retention.

- Interacting with all levels of management to ensure successful daily operations are met.

- Documenting, revising and advising action plans to improve scheduling performance and function as it pertains to fulfillment and overtime control.

- Conducting regular site visits to customer locations to ensure employees are maintaining high code of conduct.

- Recognizing and cultivating new business opportunities within his assigned market.

- Managing performance and recommending compensation, and promotional decisions.

- Ensuring subordinates personnel comply and fulfill their responsibilities and completing required company reporting.

- Maintain confidentiality of all information and data.

- Addressing any issues, provide feedback to ensure that the needs of each individual officer and/or client are heard and are being met.

26.     On November 3, 2020, Brosnan promoted Murauskas to Vice President, Regional Manager – Midwest.

27.     As the Vice President, Regional Manager – Midwest, Murauskas's job responsibilities were to manage all of the business in the Midwest region, including profitability, client relationships, and compliance.

28.     At the commencement of his employment and as a condition of his employment, Murauskas signed a Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement (the "Murauskas Agreement").   Among other things, the Murauskas Agreement contained a non-disclosure provision, an employee non-solicitation provision that prevented him from soliciting, hiring, or recruiting Brosnan's employees for a period of twenty-four (24) months after his employment ended, and a customer non-solicitation provision that prevented him from soliciting or contacting Brosnan's customers for a period of twenty-four (24) months after his employment ended.  A true and correct copy of the Murauskas Agreement is attached as **Exhibit B**.

29.     With Brosnan's support and resources, Murauskas built relationships and good will with Brosnan's customers and employees in the Midwest region.

**D.     Boston's Employment with Brosnan**

30.     Brosnan hired Boston as a Field Supervisor in Minnesota on or about August 24, 2020.

31.     Boston's responsibilities as a Field Supervisor focused on the following:

- Providing shift oversight and direction to security personnel.

- Acting as liaison for security personnel, assisting with issues between client and individual.

- Acting as face of company while on-site, addressing requests or inquiries from client management.

- Making visitations to sites, both scheduled and unannounced to conduct ongoing assessment of security personnel staffing and to deliver training and development.

- Observing security officer(s) to determine if post orders are being followed and expectations are being met and recommends/assigns training to security personnel.

- Meetings with a member of management and discuss any issues, challenges, or successes.

- Reporting personnel deficiencies to Operations Manager, District Manager and records in Lighthouse.

- Reviewing completed incident reports, Lighthouse and Securitime, coaching on performance improvements.

- Evaluating security personnel regarding appearance, demeanor, professionalism, performance of duties and responsibilities, and knowledge of policies and procedures.

32.     At the commencement of his employment and as a condition of his employment, Boston also signed the Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement (the "Boston Agreement", collectively with the Murauskas Agreement, "Agreements"), which contains the same restrictive covenants as the Murauskas Agreement.  A copy of the Boston Agreement is attached as **Exhibit C**.

33.     With Brosnan's support and resources, Boston built relationships and good will with Brosnan's customers and employees, including its clients and security officers, located in Minnesota.

**E.     Brosnan Entrusts Murauskas and Boston with its Proprietary and Confidential Information**

34.     The security services industry is built on trust.  The success of a security services company is directly dependent upon the trust and relationships it builds with its customers.  These relationships are cultivated over years, and Brosnan's employees are the key to building and maintaining these relationships and good will.

35.     Over the years and at significant expense, Brosnan has cultivated enduring relationships with its customers.  By virtue of their job duties, Murauskas and Boston were provided access to confidential information about Brosnan's customers and their security needs. Brosnan maintains a password-protected database that contains competitively sensitive information about those customers, such as: client scope of work and other contract terms, rate sheets, profit margins, tax consequences, security needs, client locations for deployed security, and client contact information (including cell phone numbers).  The Agreements define Confidential Information as including, but not limited to:

> [A]ll information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs,

formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, referral source information, client information, and client lists of the Employer Group or its businesses or any existing or prospective customer, client, referral source, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

(Exs. B-C, pp. 4-5). None of this information is publicly available or easily ascertainable, and it would be extremely valuable in the hands of a competitor.

36.     In connection with their employment with Brosnan, Murauskas and Boston spent a large amount of their time and effort developing relationships and building good will with Brosnan's customers. These customer relationships are one of the most critical aspects of Brosnan's business.

**F.    The Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement**

37.     To protect Brosnan's confidential and proprietary information and the good will Brosnan has built with its employees and its customers, Murauskas and Boston were required to sign the Agreements.

38.     In the Agreements, Murauskas and Boston acknowledged and agreed that:

[S]ervices to be rendered to the [Company] are of a special and unique character; that the Employee will obtain knowledge and skill relevant to the [Company]'s industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the [Company].

(Exs. B-C, p. 12).

39.     In the Agreements, Murauskas and Boston agreed to refrain from soliciting or contacting Brosnan's customers and employees for a period of two (2) years after their employment ended. (*See* Exs. B-C, pp. 8-9).

40. With respect to Brosnan's employees, they specifically agreed that they would not "directly or indirectly solicit, hire, recruit, or attempt to hire or recruit, any employee of the [Company] or induce the termination of employment of any employee of the [Company]." (Exs. B-C, p. 8).

41. Similarly, with respect to Brosnan's customers, they agreed that:

Employee will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the [Company]'s current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the [Company].

(Exs. B-C, p. 9).

42. The customer non-solicitation is limited in scope and only applies to customers who qualify as one of the following:

Customers or prospective customers the Employee contacted in any way during the past twelve (12) months prior to Employee's last day of employment with the Employer Group.

Customers about whom the Employee has trade secret or confidential information.

Customers who became customers during the Employee's employment with the Employer Group.

Customers about whom the Employee has information that is not available publicly.

(Exs. B-C, p. 9).

43. The Agreements also prohibit any unauthorized retention, use, or disclosure of Confidential Information (as defined in the Agreement) or trade secrets. (*See* Exs. B-C, pp. 4-9). With respect to sensitive information, Murauskas and Boston agreed:

(i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential

10

Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the [Company]) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Employer Group and, in any event, not to anyone outside of the direct employ of the Employer Group except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Employer Group, except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties).

(Exs. B-C, pp. 5-6).

44. The Agreements also state "In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Employer Group shall be entitled to, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction." (Exs. B-C, p. 12).

45. The Agreements also contain a tolling provision stating: "If the Employee violates any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Employee ceases to be in violation of such obligation." (Exs. B-C, p. 14).

46. The Agreements provide that in the event of a breach by Murauskas or Boston, Brosnan shall be entitled to payment of all costs, expenses and reasonable attorneys' fees incurred in the course of enforcing their terms. (Exs. B-C, p. 14).

**G. Murauskas Breaches his Duty of Loyalty, Resigns from Brosnan, and Immediately Violates the Murauskas Agreement.**

47.     On December 27, 2021, Murauskas submitted his letter of resignation to Brosnan, effective January 7, 2022.

48.     After Murauskas left Brosnan, Brian Doyle ("Doyle") took over Murauskas's role as Vice President, Regional Manager – Midwest.  Doyle immediately noticed that Mauraskas had not managed the region properly, to Brosnan's detriment, and that Brosnan's standards were not being adhered to in the Midwest region.  Rather than put real contracts in place per Brosnan standards, Mr. Murauskas often utilized handshake agreements which would make it easier for him to transfer business if he were to move companies.  It appeared that Mr. Mauraskas was neglecting his duties in the months before his departure, creating issues with clients, likely in an attempt to make it easier to move clients to his new employer Controlled Force.

49.     After resigning from Brosnan, Murauskas became employed by Controlled Force as a Senior Director of Administration.

50.     As Senior Director of Administration for Controlled Force, Murauskas is in a high-level business development position and is charged with running Talon.

51.     On behalf of Controlled Force, Murauskas immediately began soliciting Brosnan employees.

52.     Specifically, Murauskas reached out to Midwest Human Resources Generalist Melleah-Kathleen Hook ("Hook") in early 2022 to try and recruit her to leave Brosnan and join Controlled Force.

53.     Prior to leaving Brosnan, Murauskas told Hook that there may be an opportunity with his new company, and that he would keep her posted.  Murauskas also asked Hook if she thought Brosnan employees Jenell Murphy, Brittany Stone, Ryan Janssen, and Skylar Hornig would be interested in coming with him.

54. About a week after he left Brosnan, Murauskas called Hook to say hello and said that he may have an opportunity and would let her know. After that, Murauskas called Hook on about a weekly basis. During these calls, he would tell Hook that he may have a job opportunity with his new company and told her that he was working with Related Properties and its Property Manager for Loring Towers, Jan Peterson. He told me Hook that he could not tell her anything further until she committed to join him.

55. In February 2022, Murauskas told Hook about his new company, Controlled Force, and asked if she would come to Controlled Force to be a Human Resources Generalist. He told Hook that they could not pay what she deserved, but she could work part-time until the funds became available on April 1. Hook agreed to, and did perform part time work for Murauskas putting together job advertisements for Controlled Force, for which she was paid $27 per hour.

56. Hook ultimately decided not to join Murauskas at Controlled Force and reported Murauskas's recruiting efforts to Doyle.

57. Murauskas also solicited and attempted to recruit Brosnan's HR Coordinator – Midwest Brittany Stone ("Stone") to become Talon Investigation's HR Coordinator.

58. On or about March 1, 2022, Stone received a phone call from Murauskas, asking her to meet up with him for dinner soon, and saying he would be in contact when he was in Minnesota. On or around March 6, 2022, Murauskas called Stone and told her that he would be in Minnesota and wanted to go to dinner and catch up.

59. On March 7, 2022, Murauskas sent Stone an email inviting her to "an informal dinner meeting and job interview" at Jimmy's Food & Drink in Vadnais Heights, Minnesota on March 8. Murauskas told her in the email to "be prepared to speak about your experience."

60.     On or about March 8, 2022, Stone called and texted with Murauskas to tell him that she would meet him for dinner, and she was planning on bringing her daughter along.  He responded that was fine.

61.     At the dinner, Murauskas had his team with him from Controlled Force, which consisted of three men and Stacie Alexandria, the person Stone would potentially work with at Controlled Force. Murauskas quickly shifted the topic of discussion to Controlled Force.

62.     Stone did not feel this dinner was an appropriate setting for a job interview, and would not have invited her daughter if I knew it was going to be an interview.  The restaurant was loud, so Murauskas suggested that the group go back to his hotel across the street.

63.     At the hotel, Murauskas described Controlled Force and what he wanted Stone to do at Controlled Force in order to convince her to leave Brosnan.  Murauskas also said Brosnan is taking a turn for the worse and going downhill.

64.     Murauskas told Stone that she would be Controlled Force's HR Generalist, Recruiter, and Coordinator reporting directly to Murauskas and collaborating with Stacie Alexandria.  Murauskas told Stone that he would send her an offer letter to join Controlled Force.

65.     Sure enough, on March 15, 2022, Murauskas emailed Stone an offer letter to join "Talon Investigation, a subsidiary of Controlled FORCE, Inc."  Based on the offer letter, Stone would have reported directly to Murauskas.

66.     On or about March 23, Murauskas called Stone to see if she read over the offer letter and if she would take the position or not.  Stone told him she was still thinking about it and proceeded to tell him about the work she was doing with Brosnan.

67. On March 24, 2022, Murauskas emailed Stone, assuming that she would leave Brosnan and join Controlled Force, and asking her to meet him on March 28, 2022. Murauskas also texted Stone several times asking if she would meet with him on March 28, 2022.

68. On March 29, 2022, Murauskas emailed Stone introductions to the group charged with the management of the Talon Investigation subsidiary of Controlled Force and an organizational chart. On April 6, 2022, Murauskas emailed Stone the Talon Employee Handbook and other information about Talon's operations.

69. Ultimately, Stone decided not to join Murauskas at Controlled Force.

70. Murauskas also solicited the following Brosnan employees: Skylar Horning (Operations Manager for Ohio and Kentucky) and Ryan Jansen (District Manager for Ohio and Kentucky) to leave Brosnan for Controlled Force.

## H. Boston Violates His Duty of Loyalty and the Boston Agreement and Resigns from Brosnan to Join Murauskas at Controlled Force

71. Boston was assigned to Brosnan's Loring Towers account (through client Related Properties), where he picked up substantial overtime toward the end of his employment with Brosnan.

72. By the end of February, Boston was not performing his duties for Brosnan and breached his duty of loyalty by refusing to hire any security officers sent to him by Hook.

73. Boston specifically told Hook that Brosnan did not need to hire for the Loring Towers account.

74. Upon information and belief, this was not true, but rather Boston was not posting security officers at jobs to undermine Brosnan's relationship with Loring so he could divert it to Controlled Force.

75.     Boston would not go to hiring events and lied that there was no one there for jobs. Boston was supposed to be at the Workforce Center at a college in Rochester, Minnesota every Wednesday, but he did not hire anyone and the contact at the college did not even know who he was.

76.     Boston also attended the March 7 dinner at Jimmy's Food and Drink with Murauskas and Stone.

77.     Upon information and belief, Boston, while still employed by Brosnan, was already working with Murauskas and Controlled Force to transition the Loring Towers account to Controlled Force and Talon.

78.     Disturbingly, Brosnan has also received reports that Boston offered overtime to security officers in exchange for money payments from such officers.

79.     Later in March 2022, Boston took PTO and told Brosnan he was going to Illinois to visit his sick father.  However, Boston posted on Facebook that he was in Illinois for a job interview (with Murauskas and Controlled Force).

80.     On March 24, 2022, Boston emailed Brosnan his resignation, effective April 15, 2022, and included a demand that he only work the afternoon shift for the rest of his employment at Brosnan.

81.     Due to the discovery that Boston lied about why he was going to Illinois and that he accepted a job with Controlled Force, Brosnan accepted Boston's resignation and terminated his employment on March 25, 2022.

82.     Suspiciously, Boston initially tried to avoid returning his office key.  Boston initially gave Brosnan's Customer Expectations Team Manager Aaron Haynes ("Haynes")

***Boston's house key*** to avoid turning over his office key. Doyle instructed Haynes to change the locks at the office due to this suspicious behavior.

83.     Boston immediately began working for Controlled Force's subsidiary Talon as a Field Security Manager, a substantially similar position to the Field Supervisor position he held at Brosnan.

84.     Upon information and belief, Boston, Murauskas, and Controlled Force successfully solicited Minnesota security officers from Brosnan.

85.     After Boston left Brosnan, Stone noticed that there were 10 Bureau of Criminal Apprehension ("BCA") fingerprint cards that were missing for current Brosnan employees. Brosnan must have these BCA cards on file to be in compliance with Minnesota law. The BCA cards went missing around early February 2022. The only two Brosnan employees in the Minnesota office at the time were Boston and Haynes. Haynes and Stone figured out that Boston took the 10 BCA cards because the cards taken were for the 10 employees who Haynes and Boston hired at a job fair in or about February 2022. Only after Haynes communicated with Boston about returning the BCA cards did he did return them.

**I.     Murauskas's and Controlled Force's Lackluster Responses to Brosnan's Cease and Desist Letters**

86.     Upon learning the above information, Brosnan sent cease and desist letters, dated April 28, 2022, to Murauskas and Controlled Force. Copies of these letters (omitting enclosures) are attached as **Exhibit D**.

87.     On May 2, 2022, Murauskas responded via email with the blanket assertion that he takes his "post employment obligations seriously." Predictably, Murauskas asserted that Controlled Force is not a direct competitor of Brosnan. He stated that "the majority of the work performed by [Controlled Force] is the government training and development space." He then

attempted to distinguish his Controlled Force job duties with his Brosnan job duties. Even more troubling, Murauskas did not provide assurances that he will not solicit Brosnan's employees or customers. He also failed to deny (or even address) Brosnan's allegations that he has solicited its employees and customers. A copy of the foregoing email is attached as **Exhibit E**.

88.     On May 2, 2022, Diana Grano, Controlled Force President and CEO, responded to Brosnan's letter by contacting counsel for Brosnan via telephone. First, Ms. Grano denied that Boston works for Controlled Force. Then, Ms. Grano stated that Controlled Force is not looking for security guard work. She stated that she will make sure that Murauskas does not solicit any of Brosnan's employees or customers. Counsel for Brosnan asked Ms. Grano to respond in writing to Brosnan's allegations. To date, counsel for Brosnan has not received any such writing from Ms. Grano or Controlled Force.

89.     Brosnan also has good reason to doubt the representations made by Murauskas and Controlled Force in response to its cease-and-desist letters.

90.     Controlled Force indeed provides security services by way of security officers and guards, including in Minnesota through its subsidiary Talon. Upon information and belief, about 80% of Controlled Force's business is in the security space. In fact, Talon posted a job opening on April 13, 2022, for an Unarmed Security Officer in St. Paul, Minnesota. The posting states, "Talon Investigation, a division of Controlled FORCE, Inc. *is growing and has a need for experienced security officers*." (Ex. A, (emphasis added)).

91.     Ms. Grano's assertion that Boston does not work for Controlled Force is contradicted by Boston's Facebook page and his meeting with Murauskas and Controlled Force on March 7 and in Illinois in late March. A screenshot of Boston's Facebook page is attached as **Exhibit F**.

92.     Despite Ms. Grano's assertion that Murauskas will not solicit Brosnan's employees and customers, ***Loring Towers cancelled its contract with Brosnan the very same day counsel for Brosnan spoke with Ms. Grano***.  Now, Talon provides armed security guard services to Loring Towers.

## COUNT ONE
## BREACH OF CONTRACT – EMPLOYEE AND CUSTOMER NON-SOLICITATION PROVISIONS
### (As Against Murauskas and Boston)

93.     Brosnan repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

94.     The Murauskas Agreement is a valid, enforceable contract between Murauskas and Brosnan.

95.     Brosnan has satisfied all of its obligations under the terms and conditions of the Murauskas Agreement.

96.     Murauskas signed the Murauskas Agreement as a condition of his employment with Brosnan and thus, the Murauskas Agreement is supported by valid consideration.

97.     As demonstrated above, Murauskas has breached the Murauskas Agreement by soliciting Brosnan's employees and at least one Brosnan customer.

98.     The Boston Agreement is a valid, enforceable contract between Boston and Brosnan.

99.     Brosnan has satisfied all of its obligations under the terms and conditions of the Boston Agreement.

100.    Boston signed the Boston Agreement as a condition of his employment with Brosnan and thus, the Boston Agreement is supported by valid consideration.

101.    As demonstrated above, Boston has breached the Boston Agreement by soliciting Brosnan's employees and at least one Brosnan customer.

102.    The restrictive covenants contained in the Murauskas Agreement and Boston Agreement remain in full force and effect, and Murauskas and Boston, for good consideration, remain obligated to comply with the restrictive covenants.

103.    Murauskas's and Boston's actions have damaged Brosnan's employee and customer good will and interfered with its legitimate business interests, have resulted or will result in the loss of business and the diversion of business from Brosnan to their new employer Controlled Force, and have denied Brosnan the benefit of its bargain under the Agreements.

104.    By virtue of Murauskas's and Boston's breach of their contractual obligations, Brosnan has suffered and is continuously faced with immediate and irreparable injury and also faces significant financial damage.

105.    Brosnan is likely to succeed on the merits of its claims.

106.    Brosnan has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

107.    Greater injury will be inflicted upon Brosnan by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

## COUNT TWO
### BREACH OF DUTY OF LOYALTY/FIDUCIARY DUTY
### (Against Murauskas and Boston)

108.    Brosnan repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

109.    As part of their employment relationship with Brosnan, Murauskas and Boston owed a duty of loyalty to Brosnan at all times during his employment.

110.    Their duty of loyalty required them at all times to, among other things, act in Brosnan's interests and not in the interests of Brosnan's competitors.

111.    Upon information and belief, while employed by Brosnan, Murauskas failed to follow Brosnan's protocols in contracting with customers in order to provide "handshake" deals so customers would follow him once he left Brosnan.

112.    As set forth above, while employed by Brosnan, Boston refused to hire security officers to damage Brosnan's reputation with its customers and cause Brosnan to fail to meet its contractual obligations.  Boston also reduced the posting of security officers at Loring Towers in order to transition that account to Controlled Force.

113.    By virtue of Murauskas's and Boston's disloyal conduct, Brosnan has suffered, and continues to suffer damages.

## COUNT THREE
## MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION
### (As Against All Defendants)

114.    Brosnan repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

115.    By virtue of their employment at Brosnan and performance of responsibilities for Brosnan, Murauskas and Boston were given access to Brosnan's Confidential Information.

116.    Murauskas and Boston have disclosed and used Brosnan's Confidential Information as part of their job duties with Controlled Force, including regarding Brosnan's employees and customers.

117.    Upon information and belief, Defendants have engaged in the actual or threatened misappropriation and/or conversion of Brosnan's Confidential Information, in violation of common law.

118.    The actions of Defendants were intentional, willful, outrageous and malicious, and justify the imposition of exemplary damages.

119.    By virtue of the misappropriation by Defendants of Brosnan's Confidential Information, Brosnan has suffered and is continuously faced with immediate and irreparable injury.

120.    Brosnan is likely to succeed on the merits of its claims.

121.    Brosnan has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

122.    Greater injury will be inflicted upon Brosnan by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

## COUNT FOUR
## UNFAIR COMPETITION
### (As Against All Defendants )

123.    Brosnan repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

124.    Throughout their employment with Brosnan, Murauskas and Boston gained access to critically important, unique and valuable Confidential Information.

125.    This information about Brosnan's business, customers, and employees was never available to Brosnan's competitors or to the public at large, and Murauskas, Boston, and Controlled Force would not have had access to such information but for their employment with Brosnan.

126.    Controlled Force has improperly gained or will improperly gain access to this Confidential Information through Murauskas and/or Boston.

127.     Controlled Force has engaged in unfair competition by using Murauskas and Boston to solicit Brosnan's employees, in an effort to build Controlled Force's own business, Talon, off the back of Brosnan and divert business, customers, and employees away from Brosnan and deliberately harm the business of Brosnan.

128.     The actions of Defendants have fallen below the minimum standard of fair play and dealing acceptable in the commercial arena and thus constitute unfair competition.

129.     Defendants are enjoying or will enjoy the benefits of their unfair competition.

130.     Unless enjoined, Defendants will continue to misuse confidential information wrongfully obtained from Brosnan to harm Brosnan's business reputation, to divert a portion of Brosnan's business to Controlled Force, and to gain an unfair competitive advantage for Defendants in the security services industry.

131.     By reason of Defendants' acts of unfair competition, Brosnan has suffered and is continuously faced with immediate and irreparable injury.

132.     Brosnan is likely to succeed on the merits of its claims.

133.     Brosnan has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

134.     Greater injury will be inflicted upon Brosnan by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH CONTRACT
### (As Against Controlled Force)

135.     Brosnan repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

136. Controlled Force was and is aware of the fact that Murauskas and Boston had agreements that explicitly prohibit them from soliciting or contacting Brosnan's customers or soliciting, hiring, or recruiting employees.

137. Despite this knowledge, Controlled Force has induced and is continuing to induce Murauskas and Boston to breach their contracts with Brosnan by inducing and aiding Murauskas and Boston in soliciting Brosnan's employees and customers in violation of their agreements.

138. By reason of Controlled Force's acts of tortious interference, Brosnan has suffered and is continuously faced with immediate and irreparable injury.

139. Brosnan is likely to succeed on the merits of its claims.

140. Brosnan has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

141. Greater injury will be inflicted upon Brosnan by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

## COUNT SIX
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (As Against All Defendants)

142. Brosnan repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

143. By their aforesaid actions, Defendants are intentionally, maliciously and without justification interfering with Brosnan's current and prospective business relationships with its customers and employees.

144. Brosnan has a bona fide and reasonable expectancy of a continuing and prosperous commercial relationship with its customers and employees.

145. Defendants knew of Brosnan's bona fide and reasonable expectancy of continuing these prosperous commercial relationships with its customers and employees, and nevertheless

engaged in their actions with the intent to harm Brosnan's business and without justification or excuse.

146.     Defendants have interfered, or are attempting to interfere, with Brosnan's prospective economic advantage with those customers, including Loring Towers, that would have directed that business to Brosnan but for Defendants' illegal actions.

147.     Brosnan has been damaged in the loss of substantial revenue and reputation by the loss of the Loring Towers account.

148.     Defendants have interfered, or are attempting to interfere, with Brosnan's prospective economic advantage with its employees, who would have remained employed with Brosnan but for Defendants' illegal actions.

149.     By reason of Defendants' acts of tortious interference, Brosnan has suffered and is continuously faced with immediate and irreparable injury.

150.     Brosnan is likely to succeed on the merits of its claims.

151.     Brosnan has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

152.     Greater injury will be inflicted upon Brosnan by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

**WHEREFORE**, Brosnan demands judgment against Defendants as follows:

A.     An order restraining and enjoining Murauskas and Boston, and anyone acting in concert with them (including Controlled Force), for a period of two (2) years from the date of their last violation, from directly or indirectly soliciting, hiring, recruiting, or attempting to hire or recruit any employee of Brosnan or induce the termination of employment of any employee of Brosnan;

B.      An order restraining and enjoining Murauskas and Boston, and anyone acting in concert with them (including Controlled Force), for a period of two (2) years from the date of their last violation, from directly or indirectly soliciting, contacting, or attempting to solicit or contact, or meeting with any Brosnan's Customers for the purposes of offering or accepting goods or services similar to or competitive with those offered by Brosnan ("Customers" only includes those customers or prospective customers Murauskas or Boston contacted during the last twelve (12) months or about whom Murauskas or Boston has trade secret or confidential information.  "Customers" do not include Brosnan customers who Murauskas and Boston had an existing business relationship with that customer prior to the beginning of their employment with Brosnan);

C.      An order requiring all Defendants to immediately return all of Brosnan's confidential information and trade secrets obtained by Defendants through Murauskas's or Boston's employment with Plaintiff;

D.      An order requiring all Defendants to submit and make available their electronic devices and computer IT systems to a third-party forensic expert to examine and ensure Brosnan's confidential information and trade secrets are not contained on those devices and, if it is, to ensure the return and permanent deletion of such information;

E.      An order restraining and enjoining Defendants, and anyone acting in concert with them, from using or disclosing any of Brosnan's confidential, proprietary and trade secret information;

F.      Disgorgement of any profits, commissions or monies earned by Murauskas and Boston as a result of their unlawful conduct;

G.      Compensatory, consequential and punitive damages;

H.     Prejudgment interest;

I.     An award of attorneys' fees and costs; and

J.     Such further relief as the Court may deem just and equitable.

Dated: June 8, 2022                              Respectfully submitted,


                                                 *s/ James M. Witz*
                                                 James M. Witz, ARDC #6210443
                                                 jwitz@littler.com
                                                 Todd M. Church, ARDC #6281176
                                                 tchurch@littler.com
                                                 LITTLER MENDELSON, P.C.
                                                 321 North Clark Street, Suite 1100
                                                 Chicago, IL  60654
                                                 (312) 372-5520

                                                 Attorneys for Plaintiff
                                                 *Brosnan Risk Consultants, Ltd.*

## **VERIFICATION**

I, Brian Doyle, verify that I am the Vice President, Regional Manager - Midwest for Brosnan Risk Consultants, Ltd., Plaintiff in this proceeding, and that the facts set forth in the Verified Complaint are true and correct to the best of my knowledge, information, and belief, except (1) where expressly stated to be based upon information and belief, in which case, I believe them to be true, (2) where cited to a declaration or an exhibit attached to the Verified Complaint, and (3) legal conclusions, for which I expressly defer to Plaintiff's counsel. I understand that knowingly false statements herein are subject to the penalties of 28 U.S.C. § 1746 relating to sworn declarations to authorities.

Dated: June 7, 2022

_____
BRIAN DOYLE
Vice President, Regional Manager - Midwest
Brosnan Risk Consultants Ltd.

4878-5304-3744.9 / 114755-1001

28

EXHIBIT A

Case: 1:22-cv-02995 Document #: 1 Filed: 06/09/22 Page 30 of 78 PageID #:30



Salary
(https://www.salary.com/tools/salary-calculator/search?keyword=unarmed+security+officer)

Company
(https://www.salary.com/research/search?keyword=Talon+Investigation+a+division+of+Controlled...&page=1&type=company)

Job Openings
(https://www.salary.com/jobjobtitle=Unarmed+Security+Officer&loc

## Unarmed Security Officer

POSTED ON 4/13/2022    AVAILABLE BEFORE 6/11/2022

 Talon Investigation a division of Controlled... (https://www.salary.com/job/searchresults?jobtitle=Talon+Investigation+a+division+of+Controlled...&location=Saint+Paul%2c+MN)    Saint Paul, MN    Full Time

Job Posting for **Unarmed Security Officer** at **Talon Investigation a division of Controlled...**

Position Announcement: Unarmed Security Officer

Position Location: Multiple Locations in the Twin Cities

We are looking for competent Security Officers to join our Team! Talon Investigation, a division of Controlled FORCE, Inc. is growing and has a need for experienced security officers.

You will be responsible for detecting any suspicious behavior and preventing vandalism, thefts or other criminal behavior. Our team is well-trained in de-escalation, use of force, and leadership. The ideal candidate will inspire respect and authority as well as possess a high level of observation. The goal is to help the company in maintaining excellent working conditions by keeping our facilities safe and problem-free.

Responsibilities

Patrol premises regularly to maintain order and establish presence

Monitor and authorize entrance of vehicles or people in the property

Secure all exits, doors and windows after end of operations

Investigate people for suspicious activity or possessions

Respond to alarms by investigating and assessing the situation

Provide assistance to people in need

Apprehend and detain perpetrators according to legal protocol before arrival of authorities

Submit reports of daily activity and important occurrences

Skills

Proven experience as security officer or guard

Knowledge of legal guidelines for area security and public safety

Familiarity with report writing

Excellent surveillance and observation skills

Trained in First Aid/CPR

Completed Minnesota Pre-Assignment Training or ability to complete in order to obtain certification.

High School diploma and clear criminal background is required

Job Types: Full-time, Part-time

Pay: $18.00 - $22.00 per hour

Benefits:

Health insurance

Professional development assistance

Referral program

Schedule:

8 hour shift

Case: 1:22-cv-02995 Document #: 1 Filed: 06/08/22 Page 31 of 78 PageID #:31

Day shift

Night shift

On call

Weekend availability

Experience:

Security: 1 year (Preferred)

Work Location: Multiple Locations

View Less

☑ **Apply for this job**

☑ **Receive alerts for other** Unarmed Security Officer **job openings**

🔊 **Report this Job**

Popular **Search Topics**

Full Time(https://www.salary.com/job/searchresults?jobtitle=Unarmed+Security+Officer+Full+Time&location=MN)

Part Time(https://www.salary.com/job/searchresults?jobtitle=Unarmed+Security+Officer+Part+Time&location=MN)

Remote(https://www.salary.com/job/searchresults?jobtitle=Unarmed+Security+Officer&location=MN&type=1)

Within 2-7 Days(https://www.salary.com/job/searchresults?jobtitle=Unarmed+Security+Officer&location=MN&posttime=2-7 Days)

Security Officer Unarmed(https://www.salary.com/job/searchresults?jobtitle=Security+Officer+Unarmed&location=MN)

Unarmed Security Officer(https://www.salary.com/job/searchresults?jobtitle=Unarmed+Security+Officer&location=MN)

Security Guard - Unarmed(https://www.salary.com/job/searchresults?jobtitle=Security+Guard+-+Unarmed&location=MN)

Unarmed Security Guard(https://www.salary.com/job/searchresults?jobtitle=Unarmed+Security+Guard&location=MN)

Security Officer(https://www.salary.com/job/searchresults?jobtitle=Security+Officer&location=MN)

Access Control Security Officer(https://www.salary.com/job/searchresults?jobtitle=Access+Control+Security+Officer&location=MN)

Salary.com Estimation for **Unarmed Security Officer** in **Saint Paul, MN**

**$41,583 to $55,205**

AMEX    Add an Additional Card Member.
You can earn more rewards by sharing
the benefits of your Card Membership.    Lea
Ter

Sign up to receive alerts about other jobs with skills like those required for the **Unarmed Security Officer**.

Click the checkbox next to the jobs that you are interested in.

**Access Control Skill**

☐ **Security Guard - Armed** ⓘ

Income Estimation: $39,150 - $49,951

EXHIBIT B



4/9/19

Aaron Murauskas

Dear Aaron Murauskas:

We are very pleased to offer you a position with Brosnan Risk Consultants, Ltd. (the "Company"). This offer of at-will employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter, which override anything said to you during your interview or any other discussions about your employment with the Company.

You will be hired as a District Manager assigned to the Start-Up Expectations Team, effective 4/15/19, your start date. This is an exempt position. In your capacity as District Manager assigned to the Start-Up Expectations Team, you will perform duties and responsibilities that are reasonable and consistent with such position as may be assigned to you from time to time. As part of your duties, you may also be required to perform similar duties for the Company's affiliates. You will report directly to Tim Hopper, or another individual designated by the Company. You agree to devote your full business time, attention, and best efforts to the performance of your duties and to the furtherance of the Company's interests.

In consideration of your services, you will be paid an annual salary of $70,000, payable bi-weekly in accordance with the standard payroll practices of the Company and subject to all withholdings and deductions as required by law.

If this offer is accepted and you begin employment with the Company, you will be eligible to participate in any benefit plans and programs in effect from time to time, including 10 days vacation, group medical, dental, vision with ACA premium and other fringe benefits as are made available to other similarly situated employees of the Company, in accordance with and subject to the eligibility and other provisions of such plans and programs.

You will be subject to all applicable employment and other policies of the Company, as outlined in the Company's Employee Handbook and elsewhere.

Your employment will be subject to a formal performance review after 90 days.

Your employment will be at-will, meaning that you or the Company may terminate the employment relationship at any time, with or without cause, and with or without notice.

This offer is contingent upon:

(a) Verification of your right to work in the United States, as demonstrated by your completion of the I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of starting employment.

(b) Your execution of the Company's enclosed Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement.

(c) Satisfactory completion of a background investigation.

This offer will be withdrawn if any of the above conditions are not satisfied.

By accepting this offer, you confirm that you are able to accept this job and carry out the work that it would involve without breaching any legal restrictions on your activities, such as restrictions imposed by a current or former employer. You also confirm that you will inform the Company about any such restrictions and provide the Company with as much information about them as possible, including any agreements between you and your current or former employer describing such restrictions on your activities. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company. If you have any questions about the ownership of particular documents or other information, discuss such questions with your former employer before removing or copying the documents or information.


All of us at the Company are excited at the prospect of you joining our team. If you have any questions about the above details, please call me immediately. If you wish to accept this position, please sign below and return this letter agreement to me within 5 days. This offer is open for you to accept until 4/15/19, at which time it will be deemed to be withdrawn.

I look forward to hearing from you.

Sincerely,

BROSNAN RISK CONSULTANTS, LTD.

By: _JoAnn McNeill_____

JoAnn McNeill

Vice President, Human Resources

AGREED AND ACCEPTED:

Aaron Murauskas

_Aaron Murauskas_
_____

Date     04/09/2019

EMPLOYEE CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETE AND ASSIGNMENT OF RIGHTS AGREEMENT

This Employee Confidentiality, Non-Solicitation, Non-Compete, and Assignment of Rights Agreement ("Agreement") is entered into by and between Brosnan Risk Consultants, Ltd., a corporation of the State of New York, with its principal place of business located at One Blue Hill Plaza, 14th Floor, Pearl River, NY 10965 (the "Employer"), on behalf of itself, its subsidiaries, and other corporate affiliates (collectively referred to herein as, the "Employer Group"), and Aaron Murauskas (the "Employee"), residing at 171 W Fullerton Ave Glendale Heights, IL 60139 (the Employer and the Employee are collectively referred to herein as the "Parties"), as of date signed by the Parties below (the "Effective Date").

In consideration of the Employee's employment or continued employment by the Employer and other valuable consideration, which the Employee acknowledges to be good and valuable consideration for the Employee's obligations hereunder, the Employer Group and the Employee hereby agree as follows:

Confidential Information. The Employee understands and acknowledges that during the course of employment by the Employer Group, the Employee will have access to and learn about Confidential Information of the Employer, as defined below.

Confidential Information Defined.

For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship,

discoveries, experimental processes, experimental results, specifications, customer information, customer lists, referral source information, client information, and client lists of the Employer Group or its businesses or any existing or prospective customer, client, referral source, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified or treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information includes information developed by the Employee in the course of the Employee's employment by the Employer Group as if the Employer Group furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

Employer Group Creation and Use of Confidential Information.

The Employee understands and acknowledges that the Employer Group has invested, and continues to invest, substantial time, money and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of security and investigative services (the "Business"). The Employee understands and acknowledges that as a result of these efforts, Employer Group has created, and continues to use and create Confidential Information. This Confidential Information provides Employer Group with a competitive advantage over others in the marketplace.

Disclosure and Use Restrictions.

The Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer Group) not having a need to know and authority to know and use the Confidential

Information in connection with the business of the Employer Group and, in any event, not to anyone outside of the direct employ of the Employer Group except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Employer Group, except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to Employer.

The Employee understands and acknowledges that the Employee's obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information (whether before or after beginning employment with the Employer Group) and shall continue during and after the Employee's employment by the Employer Group until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA").

Notwithstanding any other provision of this Agreement:

The Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

if the Employee files a lawsuit for retaliation by the Employer for reporting a suspected violation of law, the Employee may disclose the Employer's trade secrets to the Employee's attorney and use the trade secret information in the court proceeding if the Employee:

files any document containing the trade secret under seal; and

does not disclose the trade secret, except pursuant to court order.

Restrictive Covenants.

Acknowledgment.

The Employee understands that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Employer Group. The Employee understands and acknowledges that the intellectual, or artistic, or others services the Employee provides to the Employer Group are unique, special, or extraordinary.

The Employee further understands and acknowledges that the Employer Group's ability to reserve its Confidential Information for the exclusive knowledge and use of the Employer Group is of great competitive importance and commercial value to the Employer Group, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity.

Non-Competition.

Because of Employer Group's legitimate business interest as described herein and the good and valuable consideration offered to the Employee, the receipt and sufficiency of which is acknowledged, Employee agrees that during the term of Employee's employment and for a period of one (1) year following Employee's last day of the Employee's employment with the Employer Group, for any reason and regardless whether employment is terminated at the option of the Employee or the Employer Group, Employee will not engage in any Prohibited Activity with any customer, prospective customer, client, prospective client, referral source, business partner, subcontractor, consultant or vendor of the Employer Group.

For purposes of this non-compete clause, "Prohibited Activity" is activity in which the Employee contributes the Employee's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the Business. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Employee from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that the Employee is not a controlling person of, or a member of a group that controls, such corporation.

This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the Employer.

Non-Solicitation of Employees.

The Employee agrees and covenants that for a period of two (2) years beginning on the last day of Employee's employment with the Employer Group, Employee will not directly or indirectly solicit, hire, recruit, or attempt to hire or recruit, any employee of the Employer Group or induce the termination of employment of any employee of the Employer Group.

This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, and Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's LinkedIn profile or connects with a Covered Employee on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section.

Non-Solicitation of Customers.

The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Employer Group, Employee will have access to and learn about much or all of the Employer Group's customer information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer.

The Employee understands and acknowledges that loss of any such customer relationship and/or goodwill will cause significant and irreparable harm to the Employer Group.

The Employee agrees and covenants, for a period of two (2) years beginning on the last day of the Employee's employment with the Employer Group, Employee will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Employer Group's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Employer Group. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's LinkedIn profile, or connects with a covered customer or former customer on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section.

This restriction shall only apply to:

Customers or prospective customers the Employee contacted in any way during the past twelve (12) months prior to Employee's last day of employment with the Employer Group.

Customers about whom the Employee has trade secret or confidential information.

Customers who became customers during the Employee's employment with the Employer Group.

Customers about whom the Employee has information that is not available publicly.

Assignment of Rights.

Definitions. The following terms have the meanings specified in this Section.

"Intellectual Property Rights" means all rights in and to U.S. and foreign (i) patents, patent disclosures, and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and works of authorship (whether copyrightable or not), including computer programs, and rights in data and databases, (iv) trade secrets, know-how, and other confidential information, and (v) all other intellectual property rights, in each case whether registered or unregistered, and including all registrations and applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection in any part of the world.

"Work Product" means all writings, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee solely or jointly with others during the period of Employee's employment by the Employer and relate in any way to the business or contemplated business, products, activities, research, or development of the Employer or result from any work performed by the Employee for the Employer (in each case, regardless of when or where the work product is prepared or whose equipment or other resources is used in preparing the same), all rights and claims related to the foregoing, and all printed, physical, and electronic copies and other tangible embodiments thereof.

Intellectual Property Rights.

Work Product. The Employee acknowledges and agrees that all right, title, and interest in and to all Work Product as well as any and all Intellectual Property Rights therein and all improvements thereto shall be the sole and exclusive property of the Employer. The Work Product is and shall at all times remain the Confidential Information of the Employer and the Employer shall have the unrestricted right (but not any obligation), in its sole and absolute discretion, to (i) use, commercialize, or otherwise exploit any Work Product or (ii) file an application for patent, copyright registration, or registration of any other Intellectual Property Rights, and prosecute or abandon such application prior to issuance or registration. No royalty or other consideration shall be due or owing to the Employee now or in the future as a result of such activities.

Work Made for Hire; Assignment. The Employee acknowledges that, by reason of being employed by the Employer at the relevant times, to the extent permitted by law, all Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the

Employer. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Employer, and its successors and assigns, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including without limitation the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Employer's right, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than the Employer would have had in the absence of this Agreement.

Limitations on Assignment. The Employee understands and acknowledges that Work Product does not include, and any provision in this Agreement requiring the Employee to assign (or otherwise providing for ownership by the Employer of) rights to an invention does not apply to, any invention that the Employee develops entirely on his or her own time without using the Employer's equipment, supplies, facilities, or trade secret information, except for those inventions that either (i) relate to the Employer's business, or actual or demonstrably anticipated research or development of the Employer; or (ii) result from any work performed by the Employee for the Employer.

Further Assurances; Power of Attorney. During and after Employee's employment, the Employee agrees to reasonably cooperate with the Employer, at the Employer's expense, to (i) apply for, obtain, perfect, and transfer to the Employer the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction throughout the world, and (ii) maintain, protect, and enforce the same, including without limitation giving testimony, and executing and delivering to the Employer any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as may be requested by the Employer. The Employee hereby irrevocably grants the Employer power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer legal ownership of the Work Product to the Employer and further the transfer, prosecution, issuance, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Employer's request (without limiting the rights the Employer shall have in such circumstances by operation of law). This power of attorney is coupled with an interest and shall not be affected by the Employee's subsequent incapacity.

Moral Rights. To the extent any copyrights are assigned under this Section, the Employee hereby irrevocably waives in favor of the Employer, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of

paternity or attribution, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" in relation to all works of authorship to which the assigned copyrights apply.

Acknowledgement. The Employee acknowledges and agrees that the Employee's services to be rendered to the Employer Group are of a special and unique character; that the Employee will obtain knowledge and skill relevant to the Employer Group's industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the Employer Group.

The Employee further acknowledges that the amount of the Employee's compensation reflects, in part, the Employee's obligations and the Employer Group's rights under this Agreement; that the Employee has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that the Employee will not be subject to undue hardship by reason of the Employee's full compliance with the terms and conditions of this Agreement or the Employer Group's enforcement thereof.

Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the "at-will" status of the employment relationship between the Employer Group and the Employee, pursuant to which either the Employer Group or the Employee may terminate the employment relationship at any time, with or without cause, and with or without notice.

Remedies. In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Employer Group shall be entitled to, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

Successors and Assigns.

Assignment by the Employer Group.

To the extent permitted by state law, the Employer Group may assign this Agreement to any subsidiary or corporate affiliate in the Employer Group or otherwise, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Employer Group. This Agreement shall inure to the benefit of the Employer Group and permitted successors and assigns.

No Assignment by the Employee.

The Employee may not assign this Agreement or any part hereof. Any purported assignment by the Employee shall be null and void from the initial date of purported assignment.

Warranty. Employee represents and warrants that the Employee is not a party to any non-compete restrictive covenant or related contractual limitation that would interfere with or hinder the Employee's ability to undertake the obligations and expectations of employment with the Employer Group.

Governing Law: Jurisdiction and Venue. This Agreement, for all purposes, shall be construed in accordance with the laws of State of New York without regard to conflicts-of-law principles. Any action or proceeding by either of the Parties to enforce this Agreement shall be brought only in any state or federal court having proper venue over Rockland County, New York. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

Entire Agreement. Unless specifically provided herein, this Agreement contains all the understandings and representations between the Employee and the Employer Group pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the parties. No waiver by either of the Parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

Severability. Should any provision of this Agreement be held by a court or arbitral authority of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement, by facsimile, electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

Tolling. If the Employee violates any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Employee ceases to be in violation of such obligation.

Attorneys' Fees. If the Employee breaches any obligations articulated herein, to the extent authorized by state law, the Employee will be responsible for payment of all reasonable attorneys' fees and costs that Employer Group incurred in the course of enforcing the terms of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

Notice. If and when Employee's employment with Employer Group terminates, whether voluntarily or involuntarily, Employee agrees to provide to any subsequent employer a copy of this Agreement. In addition, Employee authorizes Employer Group to provide a copy of this Agreement to third parties, including but not limited to, Employee's subsequent, anticipated or possible future employer.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date below.

BROSNAN RISK CONSULTANTS, LTD.

By: _Patrick J. Brosnan_

Name: Patrick J. Brosnan

Title: CEO

Date: 4/9/19

EMPLOYEE

Signature: _Aaron Murauskas_

Print Name: Aaron Murauskas

Date: 04/09/2019

# Signature Certificate

Document Ref.: PJSCB-ZEI55-RXK7G-WQWCU

Document signed by:



**Joann McNeill**

Verified E-mail:
j.mcneill@brosnanrisk.com



IP 72.80.31.74    Date: 09 Apr 2019 18:16:08 UTC



**Aaron Murauskas**

Verified E-mail:
murauskas.aaron@gmail.com



IP 71.194.22.110    Date: 09 Apr 2019 19:03:06 UTC

Document completed by all parties on:
09 Apr 2019 19:03:06 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



EXHIBIT C



8/27/2020

Quienten Boston

Dear Quienten Boston:

We are very pleased to offer you a position with Brosnan Risk Consultants, Ltd. (the "Company"). This offer of at-will employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter, which override anything said to you during your interview or any other discussions about your employment with the Company.

You will be hired as a Field Supervisor, effective 8/24/2020, your start date. This is an exempt position. In your capacity as Field Supervisor, you will perform duties and responsibilities that are reasonable and consistent with such position as may be assigned to you from time to time. As part of your duties, you may also be required to perform similar duties for the Company's affiliates. You will report directly to Aaron Murauskas, or another individual designated by the Company. You agree to devote your full business time, attention, and best efforts to the performance of your duties and to the furtherance of the Company's interests.

In consideration of your services, you will be paid an annual salary of $39,520, payable bi-weekly in accordance with the standard payroll practices of the Company and subject to all withholdings and deductions as required by law.

If this offer is accepted and you begin employment with the Company, you will be eligible to participate in any benefit plans and programs in effect from time to time, including 10 days vacation, group medical, dental, vision with ACA premium and other fringe benefits as are made available to other similarly situated employees of the Company, in accordance with and subject to the eligibility and other provisions of such plans and programs.

You will be subject to all applicable employment and other policies of the Company, as outlined in the Company's Employee Handbook and elsewhere.

Your employment will be subject to a formal performance review after 90 days.

Your employment will be at-will, meaning that you or the Company may terminate the employment relationship at any time, with or without cause, and with or without notice.

This offer is contingent upon:

(a) Verification of your right to work in the United States, as demonstrated by your completion of the I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of starting employment.

(b) Your execution of the Company's enclosed Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement.

(c) Satisfactory completion of a background investigation.

This offer will be withdrawn if any of the above conditions are not satisfied.

By accepting this offer, you confirm that you are able to accept this job and carry out the work that it would involve without breaching any legal restrictions on your activities, such as restrictions imposed by a current or former employer. You also confirm that you will inform the Company about any such restrictions and provide the Company with as much information about them as possible, including any agreements between you and your current or former employer describing such restrictions on your activities. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company. If you have any questions about the ownership of particular documents or other information, discuss such questions with your former employer before removing or copying the documents or information.

All of us at the Company are excited at the prospect of you joining our team. If you have any questions about the above details, please call me immediately. If you wish to accept this position, please sign below and return this letter agreement to me within 7 days. This offer is open for you to accept until 9/3/2020, at which time it will be deemed to be withdrawn.

I look forward to hearing from you.

Sincerely,

BROSNAN RISK CONSULTANTS, LTD.

*Ken Martin*

By: _____

Ken Martin

Senior Vice President, Human Resources

AGREED AND ACCEPTED:

Quienten Boston

*Quienten Boston*

By: _____

Date: _____
08/27/2020

EMPLOYEE CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETE AND ASSIGNMENT OF RIGHTS AGREEMENT

This Employee Confidentiality, Non-Solicitation, Non-Compete, and Assignment of Rights Agreement ("Agreement") is entered into by and between Brosnan Risk Consultants, Ltd., a corporation of the State of New York, with its principal place of business located at One Blue Hill Plaza, 14th Floor, Pearl River, NY 10965 (the "Employer"), on behalf of itself, its subsidiaries, and other corporate affiliates (collectively referred to herein as, the "Employer Group"), and Quienten Boston (the "Employee"), residing at 1213 14th Ave SE St. Cloud, MN 56034 (the Employer and the Employee are collectively referred to herein as the "Parties"), as of date signed by the Parties below (the "Effective Date").

In consideration of the Employee's employment or continued employment by the Employer and other valuable consideration, which the Employee acknowledges to be good and valuable consideration for the Employee's obligations hereunder, the Employer Group and the Employee hereby agree as follows:

Confidential Information. The Employee understands and acknowledges that during the course of employment by the Employer Group, the Employee will have access to and learn about Confidential Information of the Employer, as defined below.

Confidential Information Defined.

For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship,

discoveries, experimental processes, experimental results, specifications, customer information, customer lists, referral source information, client information, and client lists of the Employer Group or its businesses or any existing or prospective customer, client, referral source, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified or treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information includes information developed by the Employee in the course of the Employee's employment by the Employer Group as if the Employer Group furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

Employer Group Creation and Use of Confidential Information.

The Employee understands and acknowledges that the Employer Group has invested, and continues to invest, substantial time, money and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of security and investigative services (the "Business"). The Employee understands and acknowledges that as a result of these efforts, Employer Group has created, and continues to use and create Confidential Information. This Confidential Information provides Employer Group with a competitive advantage over others in the marketplace.

Disclosure and Use Restrictions.

The Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer Group) not having a need to know and authority to know and use the Confidential

Information in connection with the business of the Employer Group and, in any event, not to anyone outside of the direct employ of the Employer Group except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Employer Group, except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to Employer.

The Employee understands and acknowledges that the Employee's obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information (whether before or after beginning employment with the Employer Group) and shall continue during and after the Employee's employment by the Employer Group until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA").

Notwithstanding any other provision of this Agreement:

The Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

if the Employee files a lawsuit for retaliation by the Employer for reporting a suspected violation of law, the Employee may disclose the Employer's trade secrets to the Employee's attorney and use the trade secret information in the court proceeding if the Employee:

files any document containing the trade secret under seal; and

does not disclose the trade secret, except pursuant to court order.

Restrictive Covenants.

Acknowledgment.

The Employee understands that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Employer Group. The Employee understands and acknowledges that the intellectual, or artistic, or others services the Employee provides to the Employer Group are unique, special, or extraordinary.

The Employee further understands and acknowledges that the Employer Group's ability to reserve its Confidential Information for the exclusive knowledge and use of the Employer Group is of great competitive importance and commercial value to the Employer Group, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity.

Non-Competition.

Because of Employer Group's legitimate business interest as described herein and the good and valuable consideration offered to the Employee, the receipt and sufficiency of which is acknowledged, Employee agrees that during the term of Employee's employment and for a period of one (1) year following Employee's last day of the Employee's employment with the Employer Group, for any reason and regardless whether employment is terminated at the option of the Employee or the Employer Group, Employee will not engage in any Prohibited Activity with any customer, prospective customer, client, prospective client, referral source, business partner, subcontractor, consultant or vendor of the Employer Group.

For purposes of this non-compete clause, "Prohibited Activity" is activity in which the Employee contributes the Employee's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the Business. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Employee from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that the Employee is not a controlling person of, or a member of a group that controls, such corporation.

This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the Employer.

Non-Solicitation of Employees.

The Employee agrees and covenants that for a period of two (2) years beginning on the last day of Employee's employment with the Employer Group, Employee will not directly or indirectly solicit, hire, recruit, or attempt to hire or recruit, any employee of the Employer Group or induce the termination of employment of any employee of the Employer Group.

This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, and Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's LinkedIn profile or connects with a Covered Employee on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section.

Non-Solicitation of Customers.

The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Employer Group, Employee will have access to and learn about much or all of the Employer Group's customer information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer.

The Employee understands and acknowledges that loss of any such customer relationship and/or goodwill will cause significant and irreparable harm to the Employer Group.

The Employee agrees and covenants, for a period of two (2) years beginning on the last day of the Employee's employment with the Employer Group, Employee will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Employer Group's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Employer Group. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's LinkedIn profile, or connects with a covered customer or former customer on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section.

This restriction shall only apply to:

Customers or prospective customers the Employee contacted in any way during the past twelve (12) months prior to Employee's last day of employment with the Employer Group.

Customers about whom the Employee has trade secret or confidential information.

Customers who became customers during the Employee's employment with the Employer Group.

Customers about whom the Employee has information that is not available publicly.

Assignment of Rights.

Definitions. The following terms have the meanings specified in this Section.

"Intellectual Property Rights" means all rights in and to U.S. and foreign (i) patents, patent disclosures, and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and works of authorship (whether copyrightable or not), including computer programs, and rights in data and databases, (iv) trade secrets, know-how, and other confidential information, and (v) all other intellectual property rights, in each case whether registered or unregistered, and including all registrations and applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection in any part of the world.

"Work Product" means all writings, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee solely or jointly with others during the period of Employee's employment by the Employer and relate in any way to the business or contemplated business, products, activities, research, or development of the Employer or result from any work performed by the Employee for the Employer (in each case, regardless of when or where the work product is prepared or whose equipment or other resources is used in preparing the same), all rights and claims related to the foregoing, and all printed, physical, and electronic copies and other tangible embodiments thereof.

Intellectual Property Rights.

Work Product. The Employee acknowledges and agrees that all right, title, and interest in and to all Work Product as well as any and all Intellectual Property Rights therein and all improvements thereto shall be the sole and exclusive property of the Employer. The Work Product is and shall at all times remain the Confidential Information of the Employer and the Employer shall have the unrestricted right (but not any obligation), in its sole and absolute discretion, to (i) use, commercialize, or otherwise exploit any Work Product or (ii) file an application for patent, copyright registration, or registration of any other Intellectual Property Rights, and prosecute or abandon such application prior to issuance or registration. No royalty or other consideration shall be due or owing to the Employee now or in the future as a result of such activities.

Work Made for Hire; Assignment. The Employee acknowledges that, by reason of being employed by the Employer at the relevant times, to the extent permitted by law, all Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the

Employer. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Employer, and its successors and assigns, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including without limitation the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Employer's right, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than the Employer would have had in the absence of this Agreement.

Limitations on Assignment. The Employee understands and acknowledges that Work Product does not include, and any provision in this Agreement requiring the Employee to assign (or otherwise providing for ownership by the Employer of) rights to an invention does not apply to, any invention that the Employee develops entirely on his or her own time without using the Employer's equipment, supplies, facilities, or trade secret information, except for those inventions that either (i) relate to the Employer's business, or actual or demonstrably anticipated research or development of the Employer; or (ii) result from any work performed by the Employee for the Employer.

Further Assurances; Power of Attorney. During and after Employee's employment, the Employee agrees to reasonably cooperate with the Employer, at the Employer's expense, to (i) apply for, obtain, perfect, and transfer to the Employer the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction throughout the world, and (ii) maintain, protect, and enforce the same, including without limitation giving testimony, and executing and delivering to the Employer any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as may be requested by the Employer. The Employee hereby irrevocably grants the Employer power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer legal ownership of the Work Product to the Employer and further the transfer, prosecution, issuance, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Employer's request (without limiting the rights the Employer shall have in such circumstances by operation of law). This power of attorney is coupled with an interest and shall not be affected by the Employee's subsequent incapacity.

Moral Rights. To the extent any copyrights are assigned under this Section, the Employee hereby irrevocably waives in favor of the Employer, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of

paternity or attribution, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" in relation to all works of authorship to which the assigned copyrights apply.

Acknowledgement. The Employee acknowledges and agrees that the Employee's services to be rendered to the Employer Group are of a special and unique character; that the Employee will obtain knowledge and skill relevant to the Employer Group's industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the Employer Group.

The Employee further acknowledges that the amount of the Employee's compensation reflects, in part, the Employee's obligations and the Employer Group's rights under this Agreement; that the Employee has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that the Employee will not be subject to undue hardship by reason of the Employee's full compliance with the terms and conditions of this Agreement or the Employer Group's enforcement thereof.

Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the "at-will" status of the employment relationship between the Employer Group and the Employee, pursuant to which either the Employer Group or the Employee may terminate the employment relationship at any time, with or without cause, and with or without notice.

Remedies. In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Employer Group shall be entitled to, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

Successors and Assigns.

Assignment by the Employer Group.

To the extent permitted by state law, the Employer Group may assign this Agreement to any subsidiary or corporate affiliate in the Employer Group or otherwise, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Employer Group. This Agreement shall inure to the benefit of the Employer Group and permitted successors and assigns.

No Assignment by the Employee.

The Employee may not assign this Agreement or any part hereof. Any purported assignment by the Employee shall be null and void from the initial date of purported assignment.

Warranty. Employee represents and warrants that the Employee is not a party to any non-compete restrictive covenant or related contractual limitation that would interfere with or hinder the Employee's ability to undertake the obligations and expectations of employment with the Employer Group.

Governing Law: Jurisdiction and Venue. This Agreement, for all purposes, shall be construed in accordance with the laws of State of New York without regard to conflicts-of-law principles. Any action or proceeding by either of the Parties to enforce this Agreement shall be brought only in any state or federal court having proper venue over Rockland County, New York. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

Entire Agreement. Unless specifically provided herein, this Agreement contains all the understandings and representations between the Employee and the Employer Group pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the parties. No waiver by either of the Parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

Severability. Should any provision of this Agreement be held by a court or arbitral authority of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement, by facsimile, electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

Tolling. If the Employee violates any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Employee ceases to be in violation of such obligation.

Attorneys' Fees. If the Employee breaches any obligations articulated herein, to the extent authorized by state law, the Employee will be responsible for payment of all reasonable attorneys' fees and costs that Employer Group incurred in the course of enforcing the terms of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

Notice. If and when Employee's employment with Employer Group terminates, whether voluntarily or involuntarily, Employee agrees to provide to any subsequent employer a copy of this Agreement. In addition, Employee authorizes Employer Group to provide a copy of this Agreement to third parties, including but not limited to, Employee's subsequent, anticipated or possible future employer.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date below.

BROSNAN RISK CONSULTANTS, LTD.

*Ken Martin*

By:_____

Name: Ken Martin

Title: Senior Vice President, Human Resources

Date: 8/27/2020

Quienten Boston          *Quienten Boston*

Signature: _____

Print Name:_____Quienten Boston_____

Date:____08/27/2020_____

# Signature Certificate

Document Ref.: SCPDQ-RZCHH-YTUJK-WP6WD

Document signed by:



**Quienten Boston**

Verified E-mail:
quienten.boston@gmail.com



IP: 172.58.86.200 | Date: 28 Aug 2020 02:18:24 UTC



**Ken Martin**

Verified E-mail:
k.martin@brosnanrisk.com



IP: 174.225.131.215 | Date: 29 Aug 2020 11:40:00 UTC

Document completed by all parties on:
29 Aug 2020 11:40:00 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



# EXHIBIT D



Littler Mendelson, PC
321 North Clark Street
Suite 1000
Chicago, IL  60654

James M. Witz
312.795.3246 direct
312.372.5520 main
312.277.9416 fax
jwitz@littler.com

April 28, 2022

**VIA FEDERAL EXPRESS AND EMAIL**

Diana Grano, President and CEO
Controlled F.O.R.C.E., Inc.
335 N. River St., Ste. 200
Batavia, IL 60510
Email: dianag@controlledforce.com

Re:  **Aaron Murauskas's Post-Employment Obligations to Brosnan Risk Consultants, Ltd.**

Dear Ms. Grano:

This firm represents Aaron Murauskas's former employer Brosnan Risk Consultants, Ltd. ("Brosnan" or the "Company"), with respect to the matters addressed in this letter. It has come to Brosnan's attention that Mr. Murauskas has started working as Senior Director for Controlled F.O.R.C.E., Inc. ("Controlled Force"), a direct competitor of Brosnan, and has solicited multiple Brosnan employees to come work at Controlled Force. These activities are in direct violation of Mr. Murauskas's post-employment obligations to Brosnan contained in his Employee Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement (the "Agreement"), a copy of which we have enclosed for your reference.

The purpose of this letter is: (1) to put Controlled Force on notice of Mr. Murauskas's obligations to Brosnan under the Agreement; (2) to demand that Controlled Force immediately cease and desist assisting Mr. Murauskas's breaches of his obligations to Brosnan; and (3) to clearly communicate Brosnan's intent to take all appropriate steps necessary to protect and enforce its legal rights. In short, Brosnan demands immediate assurances that Controlled Force has not and will not assist in any breaches of the Agreement by Mr. Murauskas.

**Mr. Murauskas's Agreement with Brosnan**

As part of Mr. Murauskas's offer letter and as a condition of his employment as District Manager with Brosnan, he entered into the Agreement, effective April 9, 2019. That Agreement contains certain restrictive covenants that prohibit him from engaging in competitive activities, from directly or indirectly soliciting the Company's employees, from engaging in the direct or indirect solicitation of the Company's customers, and from taking or disclosing the Company's proprietary, trade secret and confidential information.

As provided in the Agreement, the services Mr. Murauskas provided for Brosnan were unique, special, or extraordinary. As such, the Agreement contains a non-compete provision in which Mr. Murauskas agreed that he would not become employed by a competitor of Brosnan, such as Controlled

Diana Grano, President and CEO
April 28, 2022
Page 2

Force, for a period of one (1) year following his resignation. (*See* Agreement, p. 7).

In addition, Mr. Murauskas agreed to refrain from soliciting Brosnan's customers and employees for a period of two (2) years after his employment ended. (*See* Agreement, pp. 8-9).

Furthermore, the Agreement prohibits any unauthorized retention, use, or disclosure of Brosnan's Confidential Information (as defined in the Agreement) or trade secrets. (*See* Agreement, pp. 4-9). Brosnan provided Mr. Murauskas access to sensitive confidential and proprietary information about the Company's business, customers, and employees. He is obligated to safeguard such information following the end of his employment with the Company.

### Breach of Mr. Murauskas's Obligations to Brosnan

Brosnan has reason to believe that Mr. Murauskas is competing with Brosnan by accepting the position of Senior Director at Controlled Force. As you know, Controlled Force directly competes with Brosnan, and Brosnan believes that his job duties as Senior Director are substantially similar, if not identical, to his job duties at Brosnan, which will lead to the inevitable disclosure of Brosnan's confidential, trade secret and proprietary information. Mr. Murauskas's will also inevitably come into contact and work with Brosnan's customers, clients, referral sources, business partners, etc. By providing such services on behalf of Controlled Force, Mr. Murauskas is in violation of his agreement not to compete.

Brosnan also has evidence Mr. Murauskas has violated his obligation to refrain from soliciting Brosnan's employees. Specifically, he unlawfully solicited multiple of Brosnan's employees to come join Controlled Force, including interviewing these Brosnan employees on behalf of Controlled Force. Brosnan also believes that Murauskas has interfered with Brosnan's valuable customer relationships.

### Brosnan's Intent to Protect and Enforce Its Legal Rights

Brosnan will, without hesitation, protect its legitimate business interests. Any violation of the Agreement on behalf of Controlled Force will be met with an immediate and forceful response, and we will seek every available legal and equitable remedy allowed by law against Mr. Murauskas and also against Controlled Force with respect to any tortious interference with the Agreement or inducement of a breach of fiduciary or other legal duties owed by Mr. Murauskas to Brosnan.

Further, I am putting Controlled Force on notice of possible litigation and its duty to preserve evidence, which would include, but is not necessarily limited to: all tangible documents and files and electronically-stored information that may be relevant and discoverable in the event of formal legal action, including, but not limited to, any communications between Mr. Murauskas and Controlled Force pertaining to Mr. Murauskas's hire, any communications between Mr. Murauskas and Controlled Force about any Brosnan employee, and any communications that Controlled Force received or sent to any third party containing Brosnan's confidential, proprietary, or trade secret information.[1]

---

[1] Because of the potential for litigation between Controlled Force and Brosnan, Controlled Force has a legal duty to ensure that all documents and information, both hard copy and electronic versions, that could be relevant to any

Diana Grano, President and CEO
April 28, 2022
Page 3


**<u>Conclusion</u>**

Based upon the foregoing circumstances, Brosnan has no choice but to insist upon timely and concrete assurances that Controlled Force will not continue to assist in and condone Mr. Murauskas's breaches of the Agreement or otherwise interfere with Mr. Murauskas's continuing obligations to the Company, including the terms of his Agreement, and that Controlled Force is not in possession of any of Brosnan's confidential, trade secret, or proprietary information.

To that end, we ask that Controlled Force or its attorney contact the undersigned no later than **<u>May 4, 2022</u>** to discuss resolving this matter. While we are hopeful that the parties can avoid litigation, our client stands ready to initiate legal action to ensure Mr. Murauskas's compliance with the restrictive covenants contained in the Agreement. Nothing in this letter is intended to waive, to diminish, or to extinguish any claim, right or remedy that Brosnan has in law or equity.

We look forward to your prompt response and anticipated compliance.

Very Truly Yours,

*/s/ James M. Witz*

James M. Witz

4863-8516-5083.3 / 999999-7176

---

lawsuit Brosnan files against Controlled Force or Mr. Murauskas are preserved. To comply with its duty to preserve evidence, Controlled Force should ensure that it immediately cease any process, practice, or procedure that might destroy, purge, erase, delete, or alter documents, data, and/or information, including electronically stored information, that are or may be relevant to this matter, including, without limitation, any routine process, practice, or procedure, that might lead to the destruction of documents and/or the deletion, automatic overwriting, reformatting, or purging of information stored in electronic formats, such as computer disks, hard drives, servers, e-mail accounts (whether business or personal), social networking accounts, thumb or flash drives, cell phones, VoIP systems, databases, PDAs and iPhones, backup tapes and similar electronic storage devices. If Controlled Force has any questions regarding whether records or other property are, or could be, evidence in this potential dispute, it must preserve the material.



Littler Mendelson, PC
321 North Clark Street
Suite 1000
Chicago, IL  60654

James M. Witz
312.795.3246 direct
312.372.5520 main
312.277.9416 fax
jwitz@littler.com

April 28, 2022

**VIA FEDERAL EXPRESS AND EMAIL**

Aaron Murauskas
171 W Fullerton Ave.
Glendale Heights, IL 60139
Email: murauskas.aaron@gmail.com

Re:  **Aaron Murauskas's Post-Employment Obligations to Brosnan Risk Consultants, Ltd.**

Dear Mr. Murauskas:

This firm represents your former employer Brosnan Risk Consultants, Ltd. ("Brosnan" or the "Company"), with respect to the matters addressed in this letter. It has come to Brosnan's attention that you have started working as Senior Director for Controlled F.O.R.C.E., Inc. ("Controlled Force"), a direct competitor of Brosnan, and have solicited multiple Brosnan employees to come work at Controlled Force. These activities are in direct violation of your post-employment obligations to Brosnan contained in your Employee Confidentiality, Non-Solicitation, Non-Compete and Assignment of Rights Agreement (your "Agreement"), a copy of which we have enclosed for your reference.

The purpose of this letter is: (1) to remind you of your continuing legal and contractual obligations to Brosnan; (2) to demand that you immediately cease and desist any and all conduct that breaches your continuing obligations to Brosnan; and (3) to clearly communicate Brosnan's intent to take all appropriate steps necessary to protect and enforce its legal rights. In short, Brosnan demands your full compliance with all of the promises you made in your Agreement.

**Your Agreement with Brosnan**

As you know, as part of your offer letter and as a condition of your employment as District Manager with Brosnan, you entered into the Agreement, effective April 9, 2019. That Agreement contains certain restrictive covenants that prohibit you from engaging in competitive activities, from directly or indirectly soliciting the Company's employees, from engaging in the direct or indirect solicitation of the Company's customers, and from taking or disclosing the Company's proprietary, trade secret and confidential information. Per the clear terms of your Agreement, those restrictive covenants survive your separation from the Company. When you signed the Agreement, you acknowledged and agreed that your:

"services to be rendered to the [Company] are of a special and unique character; that the Employee will obtain knowledge and skill relevant to the [Company]'s industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; and that the restrictive covenants and other terms and conditions of this Agreement are

Aaron Murauskas
April 28, 2022
Page 2

reasonable and reasonably necessary to protect the legitimate business interests of the [Company]."

(Agreement, p. 12).

You understood and acknowledged that the services you provided for Brosnan are unique, special, or extraordinary. As such, your Agreement provides that you would not become employed by a competitor of Brosnan, such as Controlled Force, for a period of one (1) year following your resignation. (*See* Agreement, p. 7).

In addition, you agreed to refrain from soliciting Brosnan's customers and employees for a period of two (2) years after your employment ended. (*See* Agreement, pp. 8-9). With respect to Brosnan's employees, you specifically agreed that you "will not directly or indirectly solicit, hire, recruit, or attempt to hire or recruit, any employee of the [Company] or induce the termination of employment of any employee of the [Company]." (Agreement, p. 8). Similarly, with respect to Brosnan's customers, you agreed that:

Employee will not directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the [Company]'s current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the [Company].

(Agreement, p. 9).

Furthermore, your Agreement prohibits any unauthorized retention, use, or disclosure of Confidential Information (as defined in the Agreement) or trade secrets. (*See* Agreement, pp. 4-9). With respect to sensitive information, you agreed:

(i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the [Company]) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Employer Group and, in any event, not to anyone outside of the direct employ of the Employer Group except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises

Aaron Murauskas
April 28, 2022
Page 3

or control of the Employer Group, except as required in the performance of the Employee's authorized employment duties to the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such duties).

(Agreement, pp. 5-6).

As a trusted employee of the Company, you were provided access to sensitive confidential and proprietary information about the Company's business, customers, and employees. You are obligated to safeguard such information following your employment with the Company.

Further, under federal and state law, you have a duty not to misappropriate, not to disclose to anyone outside of the Company, and not to use for the benefit of any third party any of Brosnan's confidential, proprietary and/or trade secret information. In addition to a breach of your Agreement, any solicitation of Brosnan's customers by you (or anyone acting on your behalf) that leverages protected information would constitute unfair competition, through the misuse and misappropriation of Brosnan's confidential and trade secret information.

Finally, you consented and agreed that Brosnan is entitled to a temporary or permanent injunction should you breach or threaten to breach your post-employment obligations to the Company. (*See* Agreement, p. 12). Brosnan is also entitled to its reasonable attorney's fees and costs incurred in the course of enforcing the terms of your Agreement. (*See id.* at p. 14).

### Breach of Your Obligations to Brosnan

Despite your agreement to be bound by the foregoing restrictions, Brosnan has reason to believe that you are competing with Brosnan by accepting the position of Senior Director at Controlled Force. As you know, Controlled Force directly competes with Brosnan, and Brosnan believes that your job duties as Senior Director are substantially similar to your job duties at Brosnan, which will lead to the inevitable disclosure of Brosnan's confidential, trade secret and proprietary information. You will also inevitably come into contact and work with Brosnan's customers, clients, referral sources, business partners, etc. By providing such services to Controlled Force, you are in violation of your Agreement not to compete.

Brosnan also has evidence you are violating your obligation to refrain from soliciting Brosnan's employees. Specifically, you unlawfully solicited multiple Brosnan's employees to come join you at Controlled Force, including interviewing Brosnan employees on behalf of Controlled Force. This blatant violation of your non-solicitation obligations is troubling and must stop immediately.  Finally, it appears that you have taken steps to directly or indirectly solicit and interfere with Brosnan's relationships with existing clients.

### Brosnan's Intent to Protect and Enforce Its Legal Rights

As this letter is intended to convey to you, Brosnan takes your legal obligations to the Company very seriously and intends to pursue all available legal and equitable remedies against you and/or any others involved in any alleged wrongdoing.

Aaron Murauskas
April 28, 2022
Page 4

Further, I am putting you on notice of possible litigation and your duty to preserve evidence, which would include, but is not necessarily limited to: all tangible documents and files and electronically-stored information that may be relevant and discoverable in the event of formal legal action, including, but not limited to, any communications between you and Controlled Force pertaining to your hire, any communications between you and any Brosnan employee, any communications between you and Controlled Force about any Brosnan employee, any Brosnan property still in your possession, and any communications that you received or sent to any third party containing Brosnan's confidential, proprietary, or trade secret information.[1] This includes text messages and social media communications as well email and other electronic records.

<u>Conclusion</u>

Based upon the foregoing circumstances, Brosnan has no choice but to insist upon timely and concrete assurances that you have and will comply with your continuing obligations to the Company, including the terms of your Agreement, and that its confidential, proprietary, and trade secret information is not at risk.

To that end, we ask that you or your attorney contact the undersigned no later than **May 4, 2022** to discuss resolving this matter. While we are hopeful that the parties can avoid litigation, our client stands ready to initiate legal action to ensure your compliance with the restrictive covenants contained in your Agreement. Nothing in this letter is intended to waive, to diminish, or to extinguish any claim, right or remedy that Brosnan has in law or equity.

We look forward to your prompt response and anticipated compliance.

Very Truly Yours,

*/s/ James M. Witz*

James M. Witz

4876-4102-9659.3 / 999999-7176

---

[1] Because of the potential for litigation between you and Brosnan, you have a legal duty to ensure that all documents and information, both hard copy and electronic versions, that could be relevant to any lawsuit Brosnan files against you are preserved. To comply with your duty to preserve evidence, you (and all other persons or entities within your control or supervision, including counsel, accountants and other professionals) should ensure that they immediately cease any process, practice, or procedure that might destroy, purge, erase, delete, or alter documents, data, and/or information, including electronically stored information, that are or may be relevant to this matter, including, without limitation, any routine process, practice, or procedure, that might lead to the destruction of documents and/or the deletion, automatic overwriting, reformatting, or purging of information stored in electronic formats, such as computer disks, hard drives, servers, e-mail accounts (whether business or personal), social networking accounts, thumb or flash drives, cell phones, VoIP systems, databases, PDAs and iPhones, backup tapes and similar electronic storage devices.

# EXHIBIT E

## Sims, Tyler

| | |
|---|---|
| **From:** | Aaron Moose <murauskas.aaron@gmail.com> |
| **Sent:** | Monday, May 2, 2022 12:30 PM |
| **To:** | Lopez, Vivian |
| **Cc:** | Witz, James; Sims, Tyler |
| **Subject:** | Re: Aaron Murauskas's Post-Employment Obligations to Brosnan Risk Consultants, Ltd. |

Good morning,

My name is Aaron Murauskas and I am providing an email (electronic reply) to the letter received and dated 28 APR 22 regarding post employment obligations to Brosnan Risk Consultants (BRC). A direct method of contacting the undersigned was not provided in the letter and I believe that the attorney representing BRC is included on this email chain.

I was a bit surprised and upset upon receipt of this letter as I take my post employment obligations seriously. Upon resignation from BRC in January 2022, I left the company in good standing and with good relationships. I was very transparent in direct conversation with BRC leadership on my next role and the company that I would be working with, to that point in a January 2022 discussion with BRC President John O'Connor I informed him specifically what I would be doing and he advised "there may be opportunity for us to partner in the future".

As for the statements made in the letter and requests for concrete assurances of the non-compete, I provide the following:

- Controlled Force (CF) is not a direct competitor of BRC. The two organizations perform work in different spaces, verticals and with different capabilities. Whereas the majority of work that BRC does is in the commercial security guarding space, the majority of work performed by CF is the government training and development space. Not only is that not in direct competition, BRC lacks the capability to perform the type and scope of work that CF performs nor do they have the accessibility to the same contracting vehicles.
- My work with BRC focused primarily on operations of a large, national security firm and my work with CF focuses on the administration of government contracting and personnel development relating to functional and support services.
- I affirm that there is not and will not be any discussion regarding BRC's trade secrets, proprietary information or operations. On the surface, there is no need to discuss it as it is not related to the work I currently perform, on a deeper level I left the company (BRC) in good standing and wish them continued success, that was made clear and has remained clear since the time of my departure.
- Subsequent to trade secrets, proprietary content, and the like, it should be noted that employees from BRC remain in contact with me seeking guidance and requesting assistance. To that point, on the day I received this letter (28 APR 22) I received a phone call from VP Ed O'Dea in BRC's National Security Division asking for a call back so that he could "pick my brain on an issue that he was having". I suppose this creates confusion when I receive a letter such as the one sent while still being sought out by your client (BRC). Just to be clear, I have not and will not return the call to avoid any further complications.

I hope this letter satisfies your inquiry and provides the assurances that have been requested of me. Furthermore, I hope that this puts any concerns at ease and that both BRC and I can move forward without further disruption. Thank you for your time, if anything else is needed please advise.

On Thu, Apr 28, 2022 at 2:40 PM Lopez, Vivian <VLopez@littler.com> wrote:

On behalf of James M. Witz, please see the attached.

**Vivian Lopez**
Legal Secretary
407.393.2955 direct, 973.643.5626 fax
VLopez@littler.com



Labor & Employment Law Solutions | Local Everywhere
111 N Orange Ave, Suite 1750, Orlando, FL 32801

-------------------------
This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

--
Mr. Aaron Murauskas
171 W. Fullerton Ave
Glendale Heights, IL
murauskas.aaron@gmail.com
773-899-6199

# EXHIBIT F

